Thank you very much. So we're going to proceed to the calendar today. We have three cases on the calendar. Two are on submission. Those cases are 20-3254, Ben's Barbecue v. County of Suffolk, and 20-3117, Kroger v. Justice Clark Richardson. Those will be on submission. And the argued case for today is 19-4238 and 20-480, United States v. Mathieu, for the appellant, Mr. Martini. Good morning. Thank you, Judge Menasche. Good morning, Mr. Lewis. Good morning, Your Honor. Judge Calabresi, Judge Parker, may it please the Court. As Judge Menasche just mentioned, I am appearing on behalf of Dr. Paul Mathieu, one of the defendants charged in this matter. I've been representing Dr. Mathieu since his arrest many years ago. We've asked the Court in our briefing for several things, and I want to first start with our request that the Court grant a new trial based on conduct that occurred primarily during the course of Dr. Mathieu's cross-examination, but that also continued in summation and also occurred during the course of the government's opening statement to the jury. And those issues concern really two big areas. The first was the government's cross-examination of Dr. Mathieu on the credibility of the government's three cooperating witnesses, and its only patient witness. And the second area concerns what has been referred to in the briefing as the peer comparison evidence, which, as I'm sure the Court is aware, consists of data that ranks doctors based on Medicaid. In this instance, Medicaid claims that they submit for particular procedures. And in this instance, the peer comparison evidence involved Dr. Mathieu's prescriptions for what were referred to as adult diapers or adult incontinence products. His prescriptions measured against other doctors in the state of New York for time periods, I believe they were 2009 to 2012. And the cross-examination that we discuss in our brief concerned taking those figures and essentially creating a peer comparison set of data for the year 2013. So those two areas are what we would have to consider whether the government's conduct here was created. I'm not hearing you. I'm sorry, Your Honor. Hello? Yeah. Okay. Can you hear me now? Yes. I'm sorry. I don't know what happened. I didn't move my head from close to the phone. But I was saying that those are the two areas that we would like the Court to focus on in the context of our claim that a new trial. Okay. So in terms of the first one, can I ask you about the cooperating witnesses? So in Richter, which is the case you cite, we said it would be a problem to ask the defendant to contrast his credibility with that of a federal agent because they generally would be seen to be truthful. But why does the same logic apply to a cooperating witness? I mean, in this case, the judge even needed to give an instruction to the jury about the cooperating witnesses to note that they had been involved in criminal conduct and had pleaded guilty for criminal conduct. And he says, the fact that the witness is an accomplice can be considered by you as bearing upon her credibility. So these government cooperators don't have the same reputation for truthfulness that an FBI agent necessarily would with respect to the jury, right? I think that's probably true, Your Honor. But as I read the cases going back to the state case of People v. Montgomery, which is cited, I believe, by this court in one of the first decisions, discussing the propriety of questioning a defendant about the credibility of other witnesses doesn't make a distinction between a lay witness and a law enforcement witness at all. But even counsel, counsel, even apart from that, don't our cases make a distinction between whether the person was asked, as was here, whether it was true, untrue, false, mistaken, as against cases where they said deliberate falsehood and liar. Haven't we said that it is all right? It's a funny distinction, but haven't our cases said that it is all right if you just say that there was that the testimony was not correct or was false, but that you're not permitted to say it was deliberately false or a liar? And isn't this case on the side of a line that we've said, OK? Judge Calabresi, you're correct that there is that distinction. And, you know, the basis to that distinction is to prevent questions that ask the witness to take the issue of transcript of Dr. Matthews' cross-examination, that while there were 18 instances where this sort of questioning occurred in our brief, I think it was 13 or 11, I can't remember the exact number now, but there were a majority of the questions that were asked fell on the side of asking the witness whether the testimony from the cooperating witness, asking Dr. Matthews the testimony from the cooperating witness was true or untrue or false or all false, completely wrong, etc. And I certainly agree that the government never asked Dr. Matthew to use the word liar in question and answer. I would submit to the court that there's really no functional difference between asking Dr. Matthew whether he... Well, you know, I don't know if there's a functional difference, but it is the difference that our cases make. I'm not sure I would have made that, but it is the one we have done. And it's a little hard to say, well, because we don't like it in the past. We're bound by our previous cases. Well, that's true, Your Honor, but I've cited some cases and I look for this, obviously, in Second Circuit jurisprudence. I look for some support and I had to go outside the circuit to find some cases that essentially support what I'm saying now, that there really is no difference when you ask a witness whether... When you ask a defendant here, Dr. Matthew, whether the cooperating witness's testimony is true, and he replies that they're not true, there's really no difference. Maybe your argument is under these circumstances of repeating the accusation of... The calculus changes. Your client is on the stand giving perjured testimony, as the trial judge found. Does that change the calculus? No, I don't think it changes the calculus at all because what's happening is happening in real time and before the jury has an opportunity to consider the issue. And the whole purpose for the rule is to avoid taking the question of witness credibility out of the hands of the jury. And if the questioning is such that you're not taking credibility out of the hands of the jury, the jury then is in charge... What about the fact that your client called into question the credibility of the government witnesses? Wouldn't that put it in issue? Does that make a difference? I don't think it makes an issue. I don't think it makes a difference in the sense that you can't... Just because Dr. Matthew gets on the stand and says, I never stopped seeing patients, doesn't mean that you can ask him... Counsel, it ultimately does not make a difference that you cannot take something out of the hands of the jury. On the other hand, to the extent that credibility has been made the essential part of the case, and it has here by you and your client, then the government has to have a certain amount of room to talk about credibility without taking it away from the jury. And that's precisely the distinction that our case has made. So that, of course, the government raised these things because credibility was an issue. Did they go so far as to take it away from the jury? That's what the cases say. Some things are and some things are not. Where am I wrong? No, I think your honor is exactly right in the sense that there are limits, in particular, in the case law that talks about the prosecutor's... How to cabinet a prosecutor's summation in these situations where credibility is at issue. The government has to be given some latitude to make arguments that a witness is lying, but the court's decisions also draw a line when it becomes excessive. And I would submit, as Judge Manasci pointed out in the Richter case, I would submit that when you have a combination of the type of questioning that we have here plus what happened in summation as we described it in our brief, that makes a difference. And that takes over the line. In this case, at the end of the day, what's your argument that this testimony rendered the trial unfair? The government adduced an awful lot of testimony as to your client's culpability, and his explanations for it were looking at the record as a whole, in some instances, just patently incredible. What's your argument as to the fundamental unfairness of this proceeding? I don't see that. The answer to that question, Your Honor, and I would take issue with the characterization of an awful lot of evidence. Yes, if you're in Judge Schofield's courtroom during the course of the trial, there were carts of documents, and it looked like a lot of evidence, and there were a lot of witnesses, and it took six weeks to try the case. But the question at the trial was, notwithstanding all these pieces of paper, whether Dr. Matthew knowingly and willfully participated in a fraud that was masterminded by Alexander Berman. And on the two prongs of liability that the government alleged, one, that he served as the nominal owner of the clinics, and secondly, that he stopped seeing patients at a particular point in time, the prejudice is, and this leads up to the point that when Dr. Matthew got on the witness stand, it was a critical moment in the trial. And that is because, with respect to the nominal owner claim, the government's evidence was, well, here are all the documents, ladies and gentlemen of the jury, you can look at them. But the government produced no witness who could testify or would testify about the circumstances surrounding the preparation of the documents. They had such a witness, they didn't call her to testify. And then when it comes to the second prong of the case about whether Dr. Matthew saw patients or not, and therefore caused the submission of false health care claims. Sorry, this point you're making about the No, no, I'm making the point about the point about the documents relates to the first prong of the government's case. And that is Dr. Matthew served as the, you know, the quote, nominal owner, close quote, close. And there was no witness who testified that I presented these documents to Dr. Matthew, he looked at them, he read them, he signed them to support the claim that he understood what he was signing and understood and intentionally made a false statement to Medicare and Medicaid, that he was the owner of the clinics. There was no such there was no such witness to that point. On the second document. Okay. Documents were pretty clear on that, weren't they? The doc? Yes. If you if you look at the documents to the to our Medicare, that he owned the clinic. And that was false. But you have there has to be more than just what the Why? In particular, why? Wasn't there also plenty of evidence that he signed things as if he were there when he was away? I mean, this is really, as Judge Parker suggested, there's plenty of evidence in this case. Well, the reason the reason why, you know, whatever, where I was going, in response to judgment ashes question, I think about, you know, why is this so significant? Where I was going with that was that the evidence about what really happened at the clinics came from the government's cooperating witnesses on the one hand, and Dr. Matthew, on the other, all the other documents, and evidence aside, what really what the government really had about what Dr. Matthew did at the witnesses, who really only testified about what they saw Dr. Matthew do. And essentially had to their testimony might be bordered on speculating about what he did. But their testimony was, well, he never saw a patient. So how do you know that? Because he came in every morning, said hi, went down the hall, sat in his room, sign charts came back out and gave them to us. And I never saw any patients go in or out. We had an expert with you're not making you you're not making a sufficiency argument, you're making a trial error argument. Well, the argument that I was making was a was a new trial argument because of the way the government cross examined Dr. Matthew at what I consider to be a critical moment at the trial, but we also are making a sufficiency argument with respect to Well, but no, but but your argument with respect to this was in answer to Judge Parker's and saying, not a sufficiency. But Judge Parker's question was essentially, any error would have been harmless, because there was so much evidence. And that's what you've been saying. There wasn't all that much evidence, which isn't a sufficiency argument. I mean, I'm not sure I agree with you, but there wasn't that much evidence. But that's your difference. And that's a perfectly fair thing to say. Yeah, that's, that's, that's my argument, Your Honor. Okay, Mr. Martini, I think we have we have the argument. You've reserved time for rebuttal. So we'll hear from you again. But let's turn to the  Okay, please. Take this take the because this is something that I really want the court to focus on, because I submit respectfully that the court can't square the district courts forfeiture order here with either traditional notions of what forfeiture is all about, or the concept of joint and several liability, as expressed by Honeycutt. And we set it out in our questions about that. But just to kind of make it in a sort of a thumbnail analysis. Traditionally, as this court held and they can't think I'll, I'll pronounce it wrong, but it's the contrariness decision. C-O-N-T-O-R-I-N-I-S talked about what the purposes of forfeiture traditionally are, and that is to take someone's ill gotten gains. And here, the ill gotten gains were Dr. Matthews salary and we're not contesting that the court properly ordered the forfeiture of Dr. Matthews salary. What we are contesting is the government's order that he forfeit two other groups of money in one group of money contained in a bank account in the pot of money in a bank account, in an account under the name of the medical office of Paul Matthew. As we set forth in the briefing, with respect to Oceanview, there really is no claim that Dr. Matthews controlled the proceeds that the Judge Schofield ordered forfeited. Everything he did in connection with that account was really pursuant to the government's theory counsel. Okay. Counsel, we have your argument on that in the brief. I expect the government to say something counter to that, and then you can reply in your reply. Thank you, Your Honor. All right. Thank you, Mr. Martini. Let's turn to the FLE, Mr. Lewis. Good morning, Your Honors. May it please the court. My name is David Raymond Lewis. I'm an assistant United States attorney in the Southern District of New York, representing the United States Department of Justice. I'm here to talk to you about the FLE trial. As each of Your Honors has mentioned this morning, the evidence of trial was overwhelming. It established, number one, the existence of a massive fraud that defrauded Medicare and Medicaid of tens of millions of dollars. And secondly, it established overwhelmingly Matthews' knowing participation in that fraud in least two distinctive respects. First, most notably, week after week, year after year, defendant Matthew traveled to the clinics in South Brooklyn, sat for a few hours alone in a room, signing enormous stacks of false medical documents in which he either, A, claimed to have seen thousands of patients for medical visits that in fact never took place, or B, signed referrals for therapy and diagnostic tests, or C, signed millions of dollars worth of medically unnecessary prescriptions for adult incontinence products for patients whom he never saw. And this signing of fraudulent documents continued even after the clinics closed, and Berman continued to pay Matthew to come to the closed clinic and meet with the former clerk and continue to sign prescriptions without any reference to any patients or medical records. That's only one of the two ways in which Matthew participated in this fraud. The other one is, as defense counsel mentioned, that he helped Berman to establish the three clinics by posing as the straw owner. And there, he signed all nature of documents, incorporating the clinics, enrolling them in Medicare, enrolling them in Medicaid, signing documents instructing Medicare and Medicaid to pay the proceeds of the claims to the accounts that Matthew had set up and that Matthew controlled. So the evidence was overwhelming, as I believe a number of the judges mentioned this morning. As to Mr. Martini's point about cross-examination, the defendant chose to testify. The cross-examination here was directly in line with the precedence of this court. At no point did the government seek to take the issue of witness credibility away from the jury. The argument which I think the appellant is making is that even though every one of these things was on the side of the line of it may have been a mistake but false, isn't the overwhelming number of them sufficient so that it falls on the other side of the line, so that in effect the government is telling the jury these witnesses are true, you are false, and that that's what we forbid. So that even if technically it is on the right side of the line, as you say, the overwhelming amount is enough to move it to the other side. Well, Judge, two responses. First of all, the contrasting with government witnesses involved four different government witnesses. So part of the sheer number of questions was because the cross-examination involved the testimony of three cooperators and it also involved the testimony of a victimized patient, a patient who had gotten diapers that she never wanted or needed. Sorry, your honor, I lost my thread for just a moment. If the government is asking him over and over again, are these people making false testimonies, completely wrong, wrong, mistaken, and so on, isn't the person essentially saying you're accusing them of being liars? Well, no. No for two reasons. First of all, no on the substance, but also I'd like to tie it in to defense counsel's mention of the summation. But the reason it's no just as to the cross-examination itself is it was necessary in the cross to make it clear he was not saying, as he was with the documents, he was saying, well, there is an explanation. The explanation is I never read anything that I ever signed. But with the contrast with the cooperating witnesses, the government was entitled, it was perfectly appropriate to establish you're not offering an is flatly untrue, that it never happened. And the government, I think, properly clarified for the jury, this is not a case of here's the explanation. This is a case of, let's be clear, the defendant's testimony is that never happened. And if I could link it to the defense's efforts to link it to summation, the government did on summation, on a number of occasions, characterize the defendant's testimony as lies. But not this testimony, not the testimony with respect to the other witnesses. The government's use of the notion of the word lied on summation was very specific and closely tied to the evidence about, number one, the signing of a stack of checks where the defendant told a completely absurd story on the stand about signing a whole stack of blank checks. And the government very carefully went through why the evidence proved that that was a lie. Number two, the government's summation said the defense was lying about signing hundreds of that where he claimed to have seen patients in clinics where he had never been. He testified he'd never been to certain clinics, but we had all these documents showing he claimed to have treated patients there or on dates when he was out of the country. So those are the times that- Counsel, I don't mean to cut you off, but I hope you will save some time to address the question of the forfeiture. Yes, Ron, let me turn to the forfeiture now. The district court properly ordered the forfeiture of the money that Matthew personally acquired in two relevant bank accounts. This was a small fraction of the fraud proceeds, and it was even a small fraction of those fraud proceeds for which Defendant Matthew personally caused. And it's in two respects. Number one, the account of the medical office of Paul J. Matthew. That was an account that the defendant himself had opened years before he knew this was his account of his clinic. He was the sole signatory on that account, and the statements for that account were sent to his home. That's point A. Point B, though that account was filled with proceeds that he had personally directed Medicare and Medicaid to send to that account. He had executed forms with Medicare and Medicaid saying, when we file claims, this is where you send the money. And lastly, as he wrote checks out of that account, he used it to pay his own bills, his rent, taxes, various expenses running the clinic, and to pay his co-conspirator, Berman. Similarly, with the second stack of checks, that was a Citibank check opened with a different co-conspirator, Kataev, in the name of a different clinic, Oceanview. But there again, Defendant Matthew is one of two signatories. It's the name of a clinic that he is telling Medicare and Medicaid he owns. The proceeds are going there at Matthew's direction. And again, he personally is writing the checks to pay co-conspirators, vendors, employees, and Berman himself. He says that he's signing the checks in a sitting, and they were all blank, and he doesn't know where the money's going. Are you saying that that's just not accurate? Or even if it were accurate, it wouldn't matter, or both? Your Honor, to quote the government's summation, that's a crazy lie, that testimony. That was 90 checks, which he claimed he had signed it blank. We pointed out on cross and on summation that amongst those 90 checks were three checks that were not even signed by him. They were signed by Berman. So even if one imagines this scenario where he's sitting down and signing 90 blank checks, you've got a picture of Berman running over in the midst of that process and signing a check every once in a while. And we made a number of arguments on summation directly tied to the evidence that that testimony isn't... That's a legal issue. So actually, if it were believable that he had signed all the checks in one sitting and that they were blank, would that defeat the presumption that he controlled the assets? Well, Your Honor, if I may, in the defendant's reply brief, they put a lot of emphasis on Judge Rakoff's recent decision in a case called Harris. And I'd like to distinguish our case and our facts from that in answering your question. In Harris, the court looked at whether the defendant could be charged with controlling the entire corporation. And that's not the argument that the government made here. Here, the government looked only to the specific checks that had gone into the account that Matthew opened, that Matthew directed be funded by Medicare, and that Matthew wrote the checks out of. We've always taken the position, Your Honor, and I think in the summation, it's pretty clear. There's no basis whatever for the testimony that Matthew gave that he signed a bunch of checks in blank. But I think even in that more difficult case, I think I would still argue that if you load the gun, if you sign 90 loaded checks and use those to further the fraud of funds that you personally have acquired, because that's what we're talking about here. These are funds that Matthew had acquired and that Matthew wrote the checks for. And that's the only part we sought to forfeit. We didn't seek to forfeit all the money that went through that account, but just that Matthew personally acquired and controlled. Good. Thank you. Okay. Thank you very much. Any questions for my colleagues? Let me just ask. No. Okay. Thank you. Go ahead. Okay. All right. Thank you, Mr. Lewis. Let's turn back to Mr. Martini on rebuttal. Mr. Martini. Thank you, Your Honor. I take issue with the fundamental premise that Dr. Matthew acquired anything apart from his salary. What we're talking about as the proceeds of the fraud that either flowed through that Citibank account or the TD Bank account, the fraud proceeds went to Alexander Berman. They didn't go to Dr. Matthew. Dr. Matthew did not, in that sense, acquire them. And as the Supreme Court said in Honeycutt, you can't obtain property that is acquired by somebody else. That's point number one. Point number two, with respect to Harris, I don't see the distinction. I mean, I understand that what Mr. Lewis said about it being an entire corporation, but I think it's fair for the court to consider each of these clinic operations as entire corporations and to consider whether somebody in Dr. Matthew's position acquired or controlled those separate clinics slash corporations. Did he have an ownership interest in them? No. Did he receive any profits from them? No. Did he exert any control over their operations? No. Did he pay personal expenses from them? Well, yes, he paid the rent out of the medical office of Paul J. Matthew Citibank account, but those aren't the proceeds of the fraud that we're talking about here. And finally, I would say that the Harris case, which we do place a lot of reliance on in our reply brief, is exactly the sort of analysis that we would ask the court to go through here. And Judge Rakoff, in that case, declined to order a forfeiture for involving a defendant who had much more control over the enterprise than Dr. Matthew had here. And then finally, what I would say is the whole idea that Dr. Matthew controlled within the legal sense, anything in these accounts is just totally undercut by the government's own theory of the case and how they chart this case and how the allegations are set forth in the indictment. And that is that Dr. Matthew made false representations to Medicare, Medicaid, and banks about his ownership of these entities. It was all a ruse according to the government. So you can't have that allegation and then come back and say, well, he controlled monies that passed through these accounts, which were set up for Berman's benefit, where the money went to Berman. And lastly, what I would say about the signing of the checks in the appendix. And I could give the court the citation to them, but if you look at the checks, they're in the appendix, you'll see, for example, in the supplemental appendix filed by the government, you'll see that while Dr. Matthew signed them, he had no role in issuing or writing the names of the payees in the checks. That was not something he did. That was something that Berman did. And the reason why it was done by Berman was to direct the fraud proceeds to him and others who were involved in the fraud with him. Dr. Matthew got none of that money. Okay. Thank you, Mr. Martini. Your time has expired. That is the last case to be argued today. The case is submitted and we are adjourned. Court stands adjourned.